# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

|  |  |  |
|---|---|---|
| ROBERT STEELE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CV 02-JEO-0058-S |
| | ) | |
| BROOKWOOD HEALTH SERVICES, INC., | ) | |
| | ) | |
| Defendant. | ) | |

**FILED**

03 APR 23 PH 3: 03

U.S. DISTRICT COURT
N.D. OF ALABAMA

**ENTERED**

APR 23 2003

## MEMORANDUM OPINION

In this action, which was commenced in Jefferson County Circuit Court, the plaintiff, Robert Steele (hereinafter "Steele" or "the plaintiff"), asserts that defendant Brookwood Health Services, Inc. (hereinafter "Brookwood" or "the defendant"), and its agent, Central Financial Control (hereinafter "CFC"), engaged in debt collection practices that violated the Fair Debt Collection Practices Act (hereinafter "FDCPA") and committed state torts of invasion of privacy, intentional infliction of mental distress, placing the plaintiff in a false light and defamation, liable and slander. (Complaint and Amended Complaint).[1]  Presently before the court are the defendant's motion for summary judgment (doc. 21)[2] and the plaintiff's motion to strike the affidavits of Susan Ainsworth (doc. 24) and Sandra Hernandez (doc. 34).  A hearing on the motions was conducted on April 1, 2003.  (Doc. 37).  Upon consideration, the court finds that the defendant's motion for summary judgment is due to be granted and the plaintiff's motions to strike are due to be granted in part and denied in part.

---

[1] The complaint and amended complaint are located at document 1 in the file.

[2] References herein to "Doc. ___" are to the document numbers assigned the pleadings by the Clerk of the Court.



### FACTUAL SUMMARY[3]

The plaintiff suffered an on-the-job injury to his left wrist in April 1997. As a result of the injury, he was hospitalized at Brookwood Medical Center. On July 7, 1997, he underwent surgery at the hospital to remove a pin or pins that had been previously inserted as a consequence of the injury. The surgery was pre-approved by workers' compensation and was preformed by Dr. David Ostrowski. (Steele Dep. at 170).[4] Ostrowski was paid for his services by the workers' compensation carrier. (*Id.* at 169-70). The plaintiff incurred additional medical expenses associated with his hospitalization, including the use of the hospital facilities and supplies. (Ainsworth Aff. at ¶ 5).[5] He does not dispute that payment was due; he asserts, however, that it is not owed by him. (Steele Dep. at 151).

Brookwood's Debt Collection System Account Detail (hereinafter "DCSAD")[6] documents show that on July 21, 1998, Brookwood sent a bill to the Department of Labor (hereinafter "DOL"), the plaintiff's workers' compensation carrier, for reimbursement of his medical expenses and charges. (DCSAD at 1-2). Brookwood contacted the DOL regarding the status of the bill on August 11, 1998, and was notified that additional time was needed to process the claim. (*Id.*). A Brookwood employee contacted DOL again on August 31, 1998, and was informed via the automated teller system that the bill was being processed. (*Id.*). Brookwood

---

[3] The facts set out below are gleaned from the parties' submissions and are viewed in a light most favorable to the plaintiff. They are the "'facts' for summary judgment purposes only. They may not be the actual facts. *See Cox v. Administrator U.S. Steel & Carnegie*, 17 F.3d 1386, 1400 (11th Cir. 1994)." *Underwood v. Life Insurance Co. of Georgia*, 14 F. Supp. 2d 1266, 1267 n.1 (N.D. Ala. 1998).

[4] Portions of the plaintiff's deposition are located at document 21, exhibit B and document 30.

[5] Ainsworth's affidavit is located at document 21, exhibit D.

[6] These documents are located at Ainsworth's affidavit, exhibits 1 & 2.

received a letter from DOL on September 1, 1998, declining Brookwood's claim for payment of the claims related to the plaintiff. (*Id.*; Steele Dep. at 170).

The plaintiff and his wife moved to Clarksdale, Mississippi, at the beginning of September 1998. (Genna Ray Steele Dep. at 26).[7] Neither of them notified Brookwood of their change of address. (*Id.* at 32-33).

Brookwood sent a form letter to the plaintiff on September 7, 1998, informing him that his insurer had denied the claim and that he was personally responsible for the balance due. (Ainsworth Aff. at Ex. 1 & 2). According to Ainsworth, an analyst in the Patient Financial Services Department, the letter would have been sent to the plaintiff's last known address which he provided to Brookwood as 1071 Parkway Drive, Leeds, Alabama 35094. (*Id.* at ¶ 5). The plaintiff never received the letter and it was not returned to Brookwood. (*Id.*; Steele Dep. at 143; Genna Ray Steele Dep. at 36-37).

On December 4, 1998, because the plaintiff's account was more than 120 days past due, it was automatically transferred to CFC for collection. (Ainsworth Aff. at ¶ 6). Brookwood undertook no additional, independent collection efforts after the account was transferred to CFC. (*Id.*).

On February 27, 2000, CFC sent the plaintiff a settlement offer to pay a percentage of the debt in settlement of the account. (Steele Dep. at 75). It stated that if his account was satisfied, any negative credit reference would be taken off his credit report. (*Id.*).

On March 22, 2000, the plaintiff received a letter from CFC, stating that his account had

---

[7] Mrs. Steele's deposition is located at document 21, exhibit C.

3

been reported to various credit bureaus as unpaid. (Interrogatory Answer 7).[8] The plaintiff

immediately contacted CFC and explained that workers' compensation was responsible for his

debt. (Steele Dep. at 57). He also contacted the defendant and spoke with Kerri Williams. (*Id.*

at 41). He told her that the bill should have been paid by workers' compensation and that the

diagnosis code should have been corrected two years ago. (*Id.* at 41). Williams instructed Steele

to send proof that the doctor's bill had been paid. On March 24, 2000, the plaintiff faxed

Williams the proof and a letter requesting that he be kept informed. He also requested an

itemized statement of his bill. (Interrogatory Answer 7). On March 31, 2000, the plaintiff

attempted to contact Williams over the telephone. She was not available so he left two messages.

(Steele Dep. at 48). His requests for a return call were not satisfied. (*Id.*). The plaintiff

described Williams' manner as very rude and harassing. (*Id.* at 42).

 CFC's records show that the plaintiff was scheduled on April 1, 2000, for a collection

call. (Doc. 30, Ex. 5; Hernandez Dep. at 94). His account was scheduled for an "account

review" on April 3, 2000. (*Id.*). There is no evidence whether those events occurred.

 On April 5, 2000, the plaintiff faxed and mailed a second letter to Williams requesting an

itemized statement of his account "for all procedures," a copy of the denial letter received by

Brookwood, copies of the bills sent regarding workers' compensation, and information on any

discrepancies on the diagnosis or CPT codes between the doctor and the hospital. (Doc. 30, Ex.

3) (underline in original). He requested the matter be cleared up as soon as possible. (*Id.*).

 On April 10, 2000, the plaintiff called Williams regarding the use of an incorrect

---

[8] The interrogatory answers are found at document 30, exhibit 1.

diagnosis code and his previous request for his records. (Steele Dep. at 50).[9] Williams told him

that he would need a subpoena to get those records. (*Id.*). Brookwood's records show that the

plaintiff's doctor's office called on April 11, 2000, and that a Post Office representative called on

April 12, 2000. (Doc. 30, Ex. 2).

On April 18, 2000, CFC received a copy of the plaintiff's letter to Brookwood disputing

liability on the account. (Doc. 30, Ex. 5; Hernandez Dep. at 94-95). On April 19, 2000, CFC

contacted the plaintiff at home concerning his account. (Doc. 30, Ex. 5 at 10). On May 4, 2000,

May 19, 2000, and June 8, 2000, the plaintiff's account was scheduled for collection calls from

CFC's representatives. (*Id.* at 9-10). His account next was transferred to CFC's National

Recovery Center for collection. (*Id.*). The plaintiff's home was contacted by CFC

representatives on June 23, 2000, July 5, 2000, and July 6, 2000. (*Id.* at 8-9).

On July 10, 2000, Dr. Ostrowski's office sent a letter to Brookwood stating as follows:

> Dr. David Ostrowski performed a pin removal on Mr. Steele on 7/10/98.
> The diagnosis code was V54.0 and 718.83. Insurance will not pay for any other
> diagnosis. Mr. Steele was turned to collections because his insurance did not pay.
> Would you please check your records and verify [that] these diagnosis codes were
> used. Thank you for your assistance.

(Doc. 30, Ex. 4).

On July 19, 2000, the plaintiff sent a letter to CFC stating that the bill was not his and it

should be presented to Brookwood and DOL. (Steele Dep. at 57-58). He also stated therein that

---

[9] Page 50 of the deposition states that he contacted Williams on April 10, 2000, "to ask again for the statement." (Steele Dep. at 50). It makes no reference to an incorrect diagnosis code. This is merely stated in the plaintiff's brief. (Doc. 30 at 2). The defendant, however, does not dispute this statement. Apparently, there were concerns that an incorrect billing code may be at the base of the problem. (*See* Steele Dep. at 92 ("talking to Connie Baker, that was the number one problem in her experience, was billing codes")).

The court raised the issue of the correctness of the billing code or codes at the hearing on the motion for summary judgment. It is unclear from the record and the arguments of counsel whether the coding was correctly done.

the bill should go through Brookwood and DOL and that CFC was to cease calling and writing him. (*Id.* at 57-58 & 170-71). Receipt of the letter by CFC is acknowledged in a September 28, 2000, CFC entry. (Doc. 30, Ex. 5 at 8). CFC entries also show that the plaintiff was scheduled to be called on October 11, 16, and 31, 2000; December 1, 6, 21, 2000; and, February 10, 2001. (*Id.* at 6-7). An October 31, 2000, entry states that CFC was waiting on a possible payment from the insurer. (Doc. 30, Ex. 5 at 7). The plaintiff confirmed that his residence was called and messages were left. (Steele Dep. at 58). The messages would simply request that he call the "1-800" number and ask for "Connie," "Amy," or some other person. (*Id.* at 58, 62). He sometimes called back and when he determined that it was CFC, he would "hang up." (*Id.* at 60, 62). The plaintiff described the messages as "rude." (*Id.* at 61). He estimated that there were no more than approximately half a dozen calls from July to October 2000. (*Id.* at 62, 66, 79).[10]

Steele obtained a copy of his credit report from Memphis Consumer Credit Association in June 2000. (Doc. 30, Ex. 6). It shows that Syndicated Office Systems (the parent company of CFC) reported an unpaid balance owed Brookwood in the amount of $2,500.00. (*Id.*). The plaintiff applied for a Chase credit card around August 2000 and was turned down due to a "derogatory credit report." (Steele Dep. at 66-67, 102). The plaintiff's October 16, 2000, Trans Union Credit Report showed that CFC had reported his unpaid Brookwood balance. (Doc. 30 at Ex. 7). The report also indicated that it had been disclosed to other financial and business entities. (*Id.*). He wrote Trans Union a letter disputing the accuracy of the information. They investigated the matter and on January 17, 2001, Trans Union informed him that the collection

---

[10] Mrs. Steele testified that she received three or four calls from CFC and that there were a minimum of three to five messages on their answering machine. (Genna Steele Dep. at 57-58).

status of the account was confirmed.[11]  (*Id.* at Ex. 8; Steele Dep. at 72).

On March 2, 2001, the plaintiff filed his initial complaint in Jefferson County Circuit Court against CFC and Brookwood.  He alleged claims for invasion of privacy, intentional infliction of emotional distress, placing him in a "false light," and defamation, liable and slander. (Doc. 1).

In April 2001, he was informed by Experian, another credit agency, that the CFC debt had been deleted.  (Steele Dep. at 76 & 106).  He also learned that the debt had been reinstated in May 2001.  (*Id.*).

On December 28, 2001, he filed an amended complaint alleging a claim under FDCPA. The matter was later removed to this court.  The plaintiff entered into a pro tanto settlement with CFC on or about June 13, 2002, and CFC was dismissed.

## MOTION TO STRIKE

The plaintiff asks the court to strike certain portions of two affidavits submitted by the defendant in support of the motion for summary judgment.  FEDERAL RULE OF CIVIL PROCEDURE 56 states, in pertinent part, that affidavits in support of or in opposition to a motion for summary judgment ". . . shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." FED. R. CIV. P. 56(e).  "If a supporting or opposing affidavit fails to conform to Rule 56(e), the opposing party may move to strike the nonconforming portion [or portions]." *Ali v. City of Clearwater*, 915 F. Supp. 1231, 1236 (M.D. Fla. 1996), citing *Interfase*

---

[11]About this same time, on January 10, 2001, after receiving repeated letters from the plaintiff disputing his liability, CFC verified the reporting of the account as accurate to the credit bureau.  (Doc. 30, Ex. 5 at 6).

*Marketing, Inc. v. Pioneer Technologies Group, Inc.*, 1993 WL 229601, *2 (M.D. Fla. June 23, 1993) and *Barnebey v. E.F. Hutton & Co.*, 715 F. Supp. 1512, 1529 (M.D. Fla. 1989).

### Ainsworth Affidavit

The plaintiff asserts that certain portions of Susan Ainsworth's affidavit are due to be struck. (Doc. 24). Specifically, he asserts that paragraph five of her affidavit is improperly premised on her "understanding" rather than personal knowledge (*id.* at ¶ 2) and that paragraph seven of the affidavit is inconsistent with her testimony during her deposition (*id.* at ¶¶ 3 & 4). The defendant retorts that paragraph five "is not invalidated by the use of the words 'it is my understanding'" (doc. 31 at 2) and paragraph seven is not "inherently inconsistent with her deposition testimony" (*id.* at 4).

Paragraph five provides as follows:

It is my understanding that Mr. Steele was hospitalized at Brookwood Medical Center on July 7, 1998, for a pin removal procedure. As a result of this hospitalization, Mr. Steele incurred medial charges and expenses. Based upon my review of the notes made in Brookwood's debt collection system, . . . , it is my understanding and belief that on July 21, 1998, Brookwood Medical Center sent a bill for [sic] to the Department of Labor, Mr. Steele's workers' compensation carrier, for reimbursement of medical expenses and charges incurred during Mr. Steele's hospitalization. On August 11, 1998, a Brookwood employee called the Department of Labor regarding the status of this bill and was advised that more time was needed for the claim to be processed. On August 31, 1998, a Brookwood employee contacted the automated teller system at the Department of Labor which indicated that the claim for Mr. Steele's bill was in process. On September 1, 1998, Brookwood received a letter from the Department of Labor declining to pay Mr. Steele's bill. As a result of the Department of Labor's denial of Mr. Steele's medical bill, this bill became a private pay bill on September 1, 1998. On September 7, 1998, Brookwood sent a form letter to Mr. Steele which advised that his insurance company rejected his claim and that he was now personally responsible for the balance of his medical bill. This letter, . . . , was a standard form letter; thus, an original copy was not retained. This letter would have been sent to the address that Mr. Steele provided to Brookwood which was 1071 Parkway Drive, Leeds, Alabama, 35094. There is nothing in Brookwood's

files to indicate that this letter was returned.

(Ainsworth Aff. at ¶ 5).

The Eleventh Circuit Court of Appeals recently stated:

> The Rules are clear: "Supporting and opposing affidavits *shall* be made on personal knowledge." FED. R. CIV. P. 56(e) (emphasis added). Rule 56(e)'s personal knowledge requirement prevents statements in affidavits that are based, in part, "upon information and belief"-- instead of only knowledge -- from raising genuine issues of fact sufficient to defeat summary judgment. *See Stewart v. Booker T. Washington Ins.*, 232 F.3d 844, 851 (11th Cir. 2000) ("upon information and belief" insufficient); *Fowler v. Southern Bell Tel. and Tel. Co.,* 343 F.2d 150, 154 (5th Cir. 1965) ("knowledge, information and belief" insufficient); *Robbins v. Gould,* 278 F.2d 116, 118 (5th Cir. 1960) ("knowledge and belief" insufficient). [ ] Likewise, an affidavit stating only that the affiant "believes" a certain fact exists is insufficient to defeat summary judgment by creating a genuine issue of fact about the existence of that certain fact. *Jameson v. Jameson,* 176 F.2d 58, 60 (D.C. Cir. 1949) ("Belief, no matter how sincere, is not equivalent to knowledge."); *see also Tavery v. United States,* 32 F.3d 1423, 1426 n.4 (10th Cir. 1994); *Hansen v. Prentice-Hall, Inc.,* 788 F.2d 892, 894 (2d Cir. 1986). Even if the affidavit is otherwise based upon personal knowledge (that is, includes a blanket statement within the first few paragraphs to the effect that the affiant has "personal knowledge of the facts set forth in th[e] affidavit"), a statement that the affiant believes something is not in accordance with the Rule. *See Cermetek, Inc. v. Butler Avpak, Inc.,* 573 F.2d 1370, 1377 (9th Cir. 1978) (equating "I understand" statement in affidavit to inadmissible "I believe" statements and concluding that statement is inadmissible despite general averment to personal knowledge at beginning of affidavit).

*Pace v. Capobianco*, 283 F.3d 1275, 1278-1279 (11th Cir. 2002) (footnotes omitted). *Pace* was an excessive force case in which police officers shot and killed a fleeing suspect. The trial court permitted consideration of an officer's affidavit which provided that he believed that the fleeing suspect was "raising his hands towards the roof of his car in an attempt to surrender." *Pace*, 283 F.3d at 1278. The Eleventh Circuit Court of Appeals stated that "[t]he district court's treatment of the 'believe' portion of Hedge's statement in his affidavit -- that Hedge 'observed motion in the red car which I believe was [Davis] raising his hands towards the roof of his car in an attempt

9

to surrender'-- as sufficient to create a fact issue about raised hands was error. [   ]" *Pace*, 283

F.3d at 1279.  The court premised this conclusion on the following:

> . . . . Hedge's observation about the apparent threat is a conclusion that is
> inadequately supported.  [ ]  Hedge's opinion does not take into account legally
> material events that occurred at a time and place that Hedge could not observe:
> Davis's acts before and during the car chase.  Hedge's view of events at the
> cul-de-sac was not in context; it is incomplete.  So, even at the summary judgment
> stage, we need not accept Hedge's threat assessment as true and correct.  His
> conclusory opinion is inadequate to create an issue of fact about the objective
> danger--in the light of all the circumstances--posed by Davis at the time of the
> shooting, much less about the objective danger that a reasonable officer in Deputy
> Clark's or Deputy Capobianco's position--considering all the circumstances--
> would have perceived at the time of the shooting.

*Pace*, 283 F.3d at 1280-81 (footnote omitted).

Unlike Hedge's affidavit in *Pace*, the use of the word "understanding" in Ainsworth's

affidavit is premised on her personal experience and knowledge from eleven years experience in

the defendant's Patient Financial Services Department and her review of the defendant's debt

collection system records concerning the plaintiff's account, which are attached to her affidavit.

(*See* Ainsworth Aff. at ¶¶ 2-5).  Her statements in paragraph five are not akin to the improper

conclusion that the trial court allowed in *Pace*.  Therefore, the motion to strike is due to be

denied as to this evidence.

Paragraph seven provides as follows:

> Based upon over ten (10) years work and experience in Patient Financial
> Services, I am familiar and knowledgeable with regard to the nature and scope of
> the relationship between Brookwood Medical Center and CFC.  There is no
> contract or formal agreement between Brookwood Medical Center and CFC.
> Brookwood exercises no control over the way in which CFC collects past due
> accounts.  Brookwood issues no guidelines or instructions to CFC with regard to
> the collection of past due accounts.  Brookwood exercises no managerial or
> supervisory responsibilities over CFC employees.  CFC employees are not
> compensated by Brookwood Medical Center.  Brookwood has no right to hire or

> fire CFC employees. Brookwood has no right to control the time or the hours
> CFC employees work. Brookwood does not train CFC employees. Brookwood
> does not direct the manner in which CFC's business is conducted. Brookwood
> does not furnish CFC or its employees with any equipment to do the business of
> CFC. Brookwood is not involved in, nor does it have any control over the day to
> day operations of CFC. CFC is not Brookwood's agent. The primary business
> purpose of Brookwood Medical Center is the delivery of healthcare services.

(Ainsworth Aff. at ¶ 7).

In *Van T. Junkins and Associates, Inc. v. U.S. Industries, Inc.*, 736 F.2d 656 (11th Cir.

1984), the court stated that "[w]hen a party has given clear answers to unambiguous questions

which negate the existence of any genuine issue of material fact, that party cannot thereafter

create such an issue with an affidavit that merely contradicts, without explanation, previously

given clear testimony." *Id.* at 657. In *Junkins*, the plaintiff brought an action against the

manufacturer of prefabricated buildings to recover for an alleged fraud and reckless

misrepresentations in denying the plaintiff a dealership after he purchased land and a building.

During his deposition, the president of the plaintiff company testified three times that there was

no condition attached to his purchasing the building. *Id.* On the motion for summary judgment,

the president stated in an affidavit that he had a meeting with representatives of the defendant

who told him that if he would purchase one of their buildings then he would be awarded the

dealership. *Id.* Affirming the trial court's grant of summary judgment for the defendant, the

court stated:

> Under these facts as presented, we agree with the district court that the
> affidavit constituted a sham. When a party has given clear answers to
> unambiguous questions which negate the existence of any genuine issue of
> material fact, that party cannot thereafter create such an issue with an affidavit that
> merely contradicts, without explanation, previously given clear testimony.

*Id.*

11

In *Tippens v. Celotex Corp.*, 805 F.2d 949, 953-54 (11th Cir. 1986), the court stated:

A definite distinction must be made between discrepancies which create transparent shams and discrepancies which create an issue of credibility or go to the weight of the evidence. "An opposing party's affidavit should be considered although it differs from or varies [from] his evidence as given by deposition or another affidavit and the two in conjunction may disclose an issue of credibility." 6 Moore's Federal Practice ¶ 56.15[4] (2d ed. 1985) (footnote omitted).

The purpose of summary judgment is to separate real, genuine issues from those which are formal or pretended. To allow every failure of memory or variation in a witness's testimony to be disregarded as a sham would require far too much from lay witnesses and would deprive the trier of fact of the traditional opportunity to determine which point in time and with which words the witness (in this case, the affiant) was stating the truth. Variations in a witness's testimony and any failure of memory throughout the course of discovery create an issue of credibility as to which part of the testimony should be given the greatest weight if credited at all. Issues concerning the credibility of witnesses and weight of the evidence are questions of fact which require resolution by the trier of fact. An affidavit may only be disregarded as a sham "when a party has given clear answers to unambiguous questions which negate the existence of any genuine issue of material fact . . . [and that party attempts] thereafter [to] create such an issue with an affidavit that merely contradicts, without explanation, previously given clear testimony." *Van T. Junkins,* at 657.

[E]very discrepancy contained in an affidavit does not justify a district court's refusal to give credence to such evidence. *See Choudhry v. Jenkins,* 559 F.2d 1085, 1090 (7th Cir.) (summary judgment was improper even though party's testimony was "not a paradigm of cogency or persuasiveness," since it was not a "transparent sham"), *cert. denied sub nom., Indiana v. Choudhry*, 434 U.S. 997, 98 S. Ct. 634, 54 L. Ed. 2d 491 (1977). In light of the jury's role in resolving questions of credibility, a district court should not reject the content of an affidavit even if it is at odds with statements made in an early deposition. *Kennett-Murray, Corp. v. Bone,* 622 F.2d 887, 894 (5th Cir. 1980).

Similarly, in *Rollins v. TechSouth, Inc.*, 833 F.2d 1525, 1530 (11th Cir. 1987), the court stated:

The law in this circuit is that a party cannot give "clear answers to unambiguous questions" in a deposition and thereafter raise an issue of material fact in a contradictory affidavit that fails to explain the contradiction. *Van T. Junkins and Associates v. U.S. Industries, Inc.*, 736 F.2d 656, 657 (11th Cir. 1984). When this occurs, the court may disregard the affidavit as a sham. *Id.* at 658-59. We apply this rule sparingly because of the harsh effect this rule may have on a party's case.

In addition, we feel that "[t]o allow every failure of memory or variation in a witness' testimony to be disregarded as a sham would require far too much from lay witnesses and would deprive the trier of fact of the traditional opportunity to determine which point in time and with which words the . . . affiant . . . was stating the truth." *Tippens v. Celotex Corp.*, 805 F.2d 949, 953-54 (11th Cir. 1986). Thus, our cases require a court to find some inherent inconsistency between an affidavit and a deposition before disregarding the affidavit. *See id.* at 954. If no inherent inconsistency exists, the general rule allowing an affidavit to create a genuine issue "even if it conflicts with earlier testimony in the party's deposition," *Kennett-Murray Corp. v. Bone*, 622 F.2d 887, 893 (5th Cir. 1980), governs. [ ] In these instances, any conflict or discrepancy between the two documents can be brought out at trial and considered by the trier of fact.

*Rollins*, 833 F.2d at 1530 (footnote omitted).

At her deposition, Ainsworth stated that she had no conversations with the individual handling the plaintiff's account. (Ainsworth Dep. at 27 & 29). She also testified that she was not involved with the handling of the plaintiff's account. (*Id.* at 31-32). She further stated that she had no personal knowledge regarding whether the letters received from the plaintiff were forwarded to CFC. (*Id.* at 34). She did note, however, that the notes in the debt collection system reflect that the plaintiff's letter was sent to CFC. (*Id.*). She next testified that she did not have any personal knowledge that Brookwood required CFC to report a patient's account as delinquent. (*Id.* at 37). Finally, she stated that she did not know all of the policies and procedures of CFC, nor did she know Brookwood's policy regarding how accounts are handled by CFC. (*Id.* at 37-38). In her affidavit, she stated that she is "familiar and knowledgeable with regard to the nature and scope of the relationship between Brookwood . . . and CFC." (Ainsworth Aff. at ¶ 7). The plaintiff asserts that this testimony is contradictory to her sworn deposition testimony and therefore should be stricken from the affidavit and not considered. (Doc. 24 at ¶ 3).

13

Based on the information presently before the court, Ainsworth's deposition testimony is not so inconsistent with her statements in paragraph seven that it should be excluded as a sham. The present situation is not as clear as the one in *Junkins*. To the extent the statements conflict, contain inconsistencies, or simply are grist for impeachment, that does not preclude their use at this juncture. The motion is due to be denied as to paragraph seven.

### Sandra Hernandez Affidavit

The plaintiff next asserts that certain portions of Sandra Hernandez's affidavit[12] are due to be struck. (Doc. 34). Specifically, he asserts that paragraphs eight and eleven of the affidavit contain improper legal conclusions (*id.* at ¶ 1), paragraphs eight and nine are improper because they misrepresent the facts (*id.* at ¶¶ 1 & 2), and the affidavit is contrary to previously given deposition testimony (*id.* at ¶ 5). The defendant retorts that these paragraphs do not contain improper legal conclusions, the facts have not been misrepresented, and the affidavit is made on personal knowledge. (Doc. 35 at ¶¶ 3-4).

Paragraph 8 provides, in pertinent part, that "Brookwood does not exercise any control over CFC's computer system." (Hernandez Aff. at ¶ 8). The court does not find this statement to be an improper legal conclusion. To the contrary, it is a statement of fact concerning Brookwood's control over the operation of CFC's computer system. The evidence will be allowed.

The plaintiff also asserts that this evidence misrepresents the facts. Specifically, the plaintiff states that Hernandez testified under oath that "Brookwood not only has access to the ACE system, but that if Brookwood chooses to, it can pull up information in CFC's system

---

[12] Hernandez's affidavit is located at document 33, exhibit A.

14

regarding how CFC is handling an account." (Doc. 34 at ¶ 2 (citing Hernandez Dep. at 41-42)).

The court does not find the affidavit statement to be inconsistent with the prior deposition

testimony.  As noted by the defendant, statements regarding "[l]imited access [do] not equal

control." (Doc. 35 at 2).  This claim is due to be denied.

Paragraph nine provides:

> CFC has authority to settle transferred accounts on behalf of Brookwood.
> CFC can settle transferred accounts without the express approval of Brookwood.
> In fact, CFC settles accounts without Brookwood's approval on a regular basis.

(Hernandez Aff. at ¶ 9).  Hernandez's deposition testimony was as follows:

> Q.    And based on Brookwood's representative's testimony, would you
> agree that Brookwood has the final say in whether CFC or SOS can offer a
> settlement or accept a lesser value on an account?
>
> A.    In 1998, yes.
>
> Q.    Is it different now?
>
> A.    It is somewhat different now. Yes.
>
> Q.    Brookwood controls CFC or SOS's ability to settle.  How is it
> different today if you can tell me briefly?
>
> A.    We have more leeway in our ability to settle accounts.

(Hernandez Dep. at 42).

Hernandez's deposition testimony is not so inconsistent with her statements in paragraph

nine that it should be excluded under *Junkins*.  The court does note, however, that it will consider

Hernandez's statement only as to the procedures applicable at the relevant time.

Paragraph eleven contains a general denial by Hernandez that "CFC did not engage in any

harassing or defamatory conduct which would constitute an invasion of privacy or any other

tortious conduct." The plaintiff is correct that this statement is an improper conclusion and is due to be struck.

To the extent that the plaintiff asserts "that the affidavit shall be made on personal knowledge and shall set forth such facts as would be admissible in evidence," the court agrees. The plaintiff does not state how the affidavit is deficient in this regard. Accordingly, to the extent the plaintiff is asserting that the affiant lacks personal knowledge, the motion is due to be denied. Hernandez states in the affidavit that it is premised on her personal knowledge (Hernandez Aff. at ¶ 1), including her nineteen years with CFC (*id.* at ¶¶ 2-3).

## SUMMARY JUDGMENT

### Standard

Summary judgment is to be granted only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the declarations, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *FED. R. CIV. P.* 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). The party asking for summary judgment "bears the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial. Only when that burden has been met does the burden shift to the nonmoving party to demonstrate that there is indeed a material issue of fact that precludes summary judgment." *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S. Ct. 1598, 1608, 26 L. Ed. 2d 142 (1970).

The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing that the nonmoving party has failed to present evidence in support of

16

some element of his case on which he bears the ultimate burden of proof. *Celotex,* 477 U.S. at

322-23; *see FED. R. CIV. P.* 56(a) and (b). Once the moving party has met his burden, Rule 56(e)

"requires the nonmoving party to go beyond the pleadings and by . . . affidavits, or by the

'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts

showing that there is a genuine issue for trial.'" *Celotex,* 477 U.S. at 324. The nonmoving party

need not present evidence in a form necessary for admission at trial; however, the movant may

not merely rest on the pleadings. *Id.*

After a motion has been responded to, the court must grant summary judgment if there is

no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.

*FED. R. CIV. P.* 56(c). Rule 56(c) mandates the entry of summary judgment against a party who

fails to make a showing sufficient to establish the existence of an element essential to that party's

case, and on which that party will bear the burden of proof at trial. *Celotex,* 477 U.S. at 322.

The substantive law will identify which facts are material and which are irrelevant.

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). A

dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the

nonmoving party." *Anderson*, 477 U.S. at 248. "[T]he judge's function is not himself to weigh

the evidence and determine the truth of the matter but to determine whether there is a genuine

issue for trial." *Anderson*, 477 U.S. at 249. A judge's guide is the same standard necessary to

direct a verdict: "whether the evidence presents a sufficient disagreement to require submission

to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*,

477 U.S. at 259; *see Bill Johnson's Restaurants, Inc. v. NLRB*, 461 U.S. 731, 745 n.11, 103 S.

Ct. 2161, 76 L. Ed. 2d 277 (1983). *Allen v. Tyson Foods, Inc.,* 121 F.3d 642, 643 (11th Cir.

1997).  However, the nonmoving party "must do more than simply show that there is some

metaphysical doubt as to the material facts."  *Matusushita Elec. Indus. Co. v. Zenith Radio*

*Corp.*, 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986).

If the evidence is merely colorable, or is not significantly probative, summary judgment

may be granted.  *Anderson*, 477 U.S. at 249 (citations omitted); *accord Spence v. Zimmerman*,

873 F.2d 256 (11th Cir. 1989).  Furthermore, the court must "view the evidence presented through

the prism of the substantive evidentiary burden," so there must be sufficient evidence on which

the jury could reasonably find for the plaintiff.  *Anderson,* 477 U.S. at 254; *Cottle v. Storer*

*Communication, Inc.,* 849 F.2d 570, 575 (11th Cir. 1988).  Nevertheless, credibility

determinations, the weighing of evidence, and the drawing of inferences from the facts are the

function of the jury, and therefore the evidence of the nonmovant is to be believed and all

justifiable inferences are to be drawn in his favor.  *Anderson*, 477 U.S. at 255.  The nonmovant

need not be given the benefit of every inference but only of every reasonable inference.  *Brown v.*

*City of Clewiston*, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988).  "If reasonable minds could differ

on the inferences arising from undisputed facts, then a court should deny summary judgment."

*Allen*, 121 F.3d at 643.  *See also Shelon v. Boston Financial, Inc.*, 638 So. 2d 824, 825 (Ala.

1994) ("In reviewing a summary judgment, we must construe the evidence in the manner most

favorable to the appellant, and we must resolve all doubts against the appellee.").

### DISCUSSION

The first issue presented by the motion for summary judgment is whether the facts and

circumstances are sufficient to show that the defendant is liable for the actions of CFC premised

on agency principles.  The plaintiff asserts that "[t]here is overwhelming evidence that a

principal/agent relationship existed between Brookwood and CFC." (Doc. 30 at 7). The
defendant asserts that there is no agency relationship between the two entities. (Doc. 33 at 4).

In support of his argument, the plaintiff cites to *Thrash v. Credit Acceptance Corp.*, 821
So. 2d 968, 971-72 (Ala. 2001). In *Thrash*, the plaintiffs brought negligence and trespass claims
against a creditor following the creditor's hiring of a third party to repossess their car after they
missed two monthly payments. In repossessing the car, the recovery company placed
dishwashing liquid on the plaintiffs' driveway to make it easier to drag the car from the carport to
the street. As a result of this action, one of the plaintiffs slipped and was injured. The trial court
entered summary judgment for creditor finding that the recovery company was not acting as an
agent of the creditor. The Alabama Supreme Court reversed the trial court. In doing so, it stated
as follows:

> . . . . This Court stated the controlling principles of agency law in
> *Malmberg v. American Honda Motor Co., Inc.*, 644 So. 2d 888, 890 (Ala. 1994):
>
>> "Agency is generally a question of fact to be determined by
>> the trier of fact. *See Oliver v. Taylor*, 394 So. 2d 945 (Ala. 1981).
>> When a defendant's liability is to be based on agency, agency may
>> not be presumed; rather, when on a motion for summary judgment
>> a defendant has made a prima facie showing that there was no
>> agency relationship, the party asserting agency has the burden of
>> presenting substantial evidence of the alleged agency. *Carlton v.*
>> *Alabama Dairy Queen, Inc.*, 529 So. 2d 921 (Ala. 1988); *Wood v.*
>> *Shell Oil Co.*, 495 So. 2d 1034 (Ala. 1986). The *test* to be applied
>> in determining whether there existed an agency relationship based
>> on actual authority is whether the alleged principal exercised a
>> *right of control* over the manner of the alleged agent's
>> performance. Control must be proven; and proof of control
>> requires more than proof of a mere right to determine if the person
>> claimed to be an agent is conforming to the requirements of a
>> contract. *Id*."

(Emphasis added.) The right-of-control test requires that the right be reserved, not

19

that the right be actually exercised.

> "The test for determining whether a person is an agent or
> employee of another, rather than an independent contractor with
> that other person, is whether that other person has reserved the
> right of control over the means and method by which the person's
> work will be performed, whether or not the right of control is
> actually exercised. *Alabama Power Co. v. Beam*, 472 So. 2d 619
> (Ala. 1985). How the parties characterize the relationship is of no
> consequence; it is the facts of the relationship that control."
> *Martin v. Goodies Distribution*, 695 So. 2d 1175, 1177 (Ala.
> 1997).

*Thrash*, 821 So. 2d at 971-72. The court found that the creditor had reserved the right of control

over the manner in which the recovery agency repossessed their automobile so as to create

principal/agency liability. This conclusion was premised on the fact that the creditor told the

company not to make any contact with the debtor before a repossession. As a result of this

action, the court found that Mrs. Thrash concluded that the vehicle was being stolen, and she so

informed her husband, leading to his injury when he rushed home from work because he also

thought the car was being stolen.[13] The court also found that the creditor was aware that the

company was using a lubricant in the repossession process and it had the authority to instruct the

company to abandon its use, thus evidencing its retained right of control over the manner of the

company's performance. *Id.*, 821 So. 2d at 972.

The plaintiff herein asserts that the following facts evidence Brookwood's right of

control:

> (1) all of Brookwood's accounts are turned over to CFC for collection;
> (2) Brookwood maintains access to CFC's debt collection system; (3) Brookwood
> controls whether an account is reported to the credit bureaus; (4) Brookwood

---

[13] Mr. Thrash was injured when he slipped on the dishwashing liquid when he was getting out of his vehicle at the residence.

controls whether CFC reports specific accounts; (5) Brookwood can instruct CFC to delete an account from being reported to the national credit reporting agencies; (6) Brookwood has the authority to instruct CFC to place a hold on an account in order to stop all collection activity; and (7) Brookwood maintains absolute control over whether CFC can settle an account that has been turned over for collection.

(Doc. 30 at 8-9). The plaintiff also notes that Brookwood also communicated with the plaintiff about his account when it was in dispute and Brookwood did not tell him to handle the matter directly with CFC. (*Id*. at 9). The defendant asserts that it does not retain the requisite right of control under the circumstances. (Doc. 33 at 5-6).

Ainsworth's affidavit describes the interaction between Brookwood and CFC as follows:

When a patient is admitted to Brookwood Medical Center, a patient account is established through which medical expenses are billed. Medical expenses are billed through the Billing Department which is a division of Patient Accounting. In 1998, once an account became 120 days past due it was transferred to collections. Upon transfer of a past due account to collections, the account would be reviewed and statused for automatic assignment to Syndicated Office Systems, Inc., d/b/a Central Financial Control for collection purposes. Syndicated Office Systems, Inc., d/b/a Central Financial Control, hereafter "CFC", is a corporation that undertakes collection of past due patient accounts for Brookwood Medical Center. After Brookwood assigns a patient account to CFC, it ceases any independent collection efforts with respect to the account assigned to CFC. CFC then makes a determination of how to proceed with the collection of a past due patient account. Brookwood is not involved in the collection efforts or activities of a patient account once it has been assigned to CFC. If a patient contacts Brookwood regarding his or her account after the account has been assigned to CFC, Brookwood refers the patient to CFC.

Based upon over ten (10) years work and experience in Patient Financial Services, I am familiar and knowledgeable with regard to the nature and scope of the relationship between Brookwood Medical Center and CFC. There is no contract or formal agreement between Brookwood Medical Center and CFC. Brookwood exercises no control over the way in which CFC collects past due accounts. Brookwood issues no guidelines or instructions to CFC with regard to the collection of past due accounts. Brookwood exercises no managerial or supervisory responsibilities over CFC employees. CFC employees are not compensated by Brookwood Medical Center. Brookwood has no right to hire or fire CFC employees. Brookwood has no right to control the time or the hours

21

CFC employees work. Brookwood does not train CFC employees. Brookwood does not direct the manner in which CFC's business is conducted. Brookwood does not furnish CFC or its employees with any equipment to do the business of CFC. Brookwood is not involved in, nor does it have any control over the day to day operations of CFC. CFC is not Brookwood's agent. The primary business of Brookwood Medical Center is the delivery of healthcare services.

(Ainsworth Aff. at ¶¶ 4 & 7). Hernandez described it as follows:

CFC is assigned accounts from Brookwood through an electronic transfer. Once Brookwood transfers a patient account to CFC, CFC then undertakes all collection efforts with regard to the transferred account. For example, CFC determines when and if any communications are initiated in an effort to collect a transferred account. CFC makes this determination without approval from Brookwood. CFC decides the manner in which transferred accounts are collected. CFC does not report to Brookwood the manner in which it undertakes its collection efforts.

CFC collectors are trained and monitored by CFC supervisors. CFC collectors are also monitored through account reviews. These account reviews are conducted by CFC. Brookwood does not participate in account reviews, nor does Brookwood have any involvement with regard to the training or supervision of CFC collectors. Brookwood does not monitor CFC collectors or the handling or collection of CFC accounts.

CFC determines when an account is reported to a credit bureau. This determination is made by CFC without the consent or approval by Brookwood. CFC does not contact Brookwood when an account is reported to a credit bureau or credit agency.

CFC uses the "ACE" Computer System in the collection of transferred accounts. This computer system is separate and apart from Brookwood's debt collection system. Thus, CFC and Brookwood do not share the same computer system. Brookwood does not exercise any control over CFC's computer system.

CFC has authority to settle transferred accounts on behalf of Brookwood. CFC can settle transferred accounts without the express approval of Brookwood. In fact, CFC settles accounts without Brookwood's approval on a regular basis.

Brookwood exercises no managerial or supervisory responsibilities over CFC employees. CFC employees are not compensated by Brookwood Medical Center. Brookwood has no right to hire or fire CFC employees. Brookwood has no right to control the time or the hours CFC employees work. Brookwood does

22

not train CFC employees.  Brookwood does not furnish CFC or its employees
with any equipment to do the business of CFC.  Brookwood is not involved in,
nor does it have any control over the day to day operations of CFC.

(Hernandez Aff. at ¶¶ 5-10).

The defendant asserts that the evidence in this case demonstrates that there is no agency

relationship between it and CFC.  Specifically, its states that

(1) once an account is transferred from Brookwood to CFC, CFC undertakes all
collection efforts with regard to the transferred account; (2) CFC determines,
without the approval of Brookwood, when and if any communications are
initiated in an effort to collect a transferred account; (3) CFC decides the manner
in which transferred accounts are collected; (4) CFC does not report to
Brookwood the manner in which it undertakes collection efforts; and (5) CFC
determines when an account is reported to a credit bureau without consent or
approval by Brookwood.  Moreover, Brookwood does not monitor CFC collectors
or the handling of CFC accounts.  Nor does Brookwood have any involvement in
the training or supervision of CFC collectors.  Brookwood cannot recall an
account once it is sent to CFC.  Brookwood and CFC use different computer
systems.  Brookwood has no managerial or supervisory responsibilities over CFC
employees, nor does Brookwood compensate CFC employees.  Brookwood does
not have the right to hire, fire or control the hours CFC employees work.  In sum,
Brookwood is not involved in, nor does it control the day to day operations of
CFC.

(Doc. 33 at 6-7 (footnotes omitted)).

As to the plaintiff's first item demonstrating control -- that all of Brookwood's accounts

are turned over to CFC for collection -- the court does not find this to be sufficient or even

significant under the circumstances.  This evidence does not show that Brookwood reserved any

right of control right over the means and method by which CFC's work will be performed.  The

court also does not find the second item -- that Brookwood maintains access to CFC's debt

collection system -- significant.  An ability to access the status of an account does not

demonstrate a right of control over the means and method of collection.

23

As to the third, fourth, fifth, and sixth items -- that Brookwood controls whether an account is reported to the credit bureaus, controls whether CFC reports specific accounts, can instruct CFC to delete an account from being reported, and can instruct CFC to place a hold on an account to stop collection activity -- the record is not as clear. Hernandez states that once an account is transferred to CFC for collection, CFC undertakes all collection efforts and does not report the manner with which it undertakes its efforts. Similarly, Ainsworth states, "Brookwood exercises no control over the way in which CFC collects past due accounts" or the way its "business is conducted." (Ainsworth Aff. at ¶ 7). In contravention of these statements, the plaintiff asserts that Hernandez stated in her deposition that Brookwood controls whether an account is reported to the credit bureaus, controls whether CFC reports specific accounts, can instruct CFC to delete an account from being reported, and can instruct CFC to place a hold on an account to stop collection activity. He cites to Hernandez's deposition which provides:

Q.    And when is that [(using a block code to prevent reporting)] done or when can that be done?

A.    It can be done for different various reasons. The hospital calls and doesn't want it to go to the credit bureau.

Q.    Can you think of other instances where a block code would be used?

A.    We have payment arrangements with the patient. There is a risk management issue.

Q.    Any others you can think of?

A.    There is a valid dispute.

Q.    Any others?

A.    No.

Q.    Have those reasons for entering a block code been the same regardless of when the system changed?

A.    Yes.

Q.    So if Brookwood Hospital or Brookwood Medical Center Services called CFC and stated: We don't want Mr. Steele's account reported, a block code could have been entered that would have prevented it from being reported to the credit bureau?

A.    Yes.

Q.    Do your records indicate that Brookwood ever contacted you and requested that Mr. Steele's account not be reported?

A.    No.

Q.    When Brookwood receives information from a patient on their account, such as a dispute, is that information to your knowledge forwarded to CFC or SOS?

         . . . .

A.    I think they try to get it to us.  You know, I can't say every case that's happened, because there are so many accounts.

Q.    Are those documents generally forwarded by computer transmittal, fax, mail?

A.    Either mail -- or now it would be e-mail.  They may send us an e-mail or call us.

Q.    In reviewing the records that you have from the ACE system, do you show that documents were received from Brookwood indicating that Mr. Steele disputed the account?

A.    I'm looking here on 6/8 of 2000, and it says something about -- it says: Letter from . . . .

         . . . .

Q.    Did Brookwood ever tell CFC to remove the account from the credit reporting agencies on Robert Steele?

         . . . .

25

A.     There is no documentation to that.

Q.     If Brookwood had requested that the account be deleted from his credit file, would
       that be something that's maintained in your computer log?

A.     It would be notated on the system.

(Hernandez Dep. at 56-57, 60).

On a motion for summary judgment, the court must accept the testimony that Brookwood

had the ability to use a "block code" to prevent the reporting of a patient's delinquent account to

a credit agency.  The court does not find this to be sufficient to overcome the motion for

summary judgment. Such reporting is but one tool by which CFC can perform its work.

Brookwood's ability to prevent the use of this one tool (which is arguably necessary in case of

genuine disputes, or other circumstances) is not a right of control significant enough to render

Brookwood liable for CFC's actions under *Thrash*, and to overcome the well-settled premise that

a principal is not ordinarily liable for the actions of an independent contractor.  *See Ex parte Wild*

*Wild West*, 806 So. 2d 1235, 1241 (Ala. 2001) ("it is a 'well-settled rule that a principal is not

ordinarily liable for the torts of its independent contractor'" ), quoting *Joseph Land & Co. v.*

*Gresham*, 603 So. 2d 923, 926 (Ala. 1992).  Although reporting a delinquent account to a credit

agency is one tool or means by which CFC may precipitate collection of a delinquent account,

Brookwood's right to control in this regard is not significant in the broad view of CFC's duties

and the tools available to it.  Thus, this is not in and of itself sufficient to overcome the motion

for summary judgment.

Regarding the seventh claim -- that Brookwood maintains absolute control over whether

CFC can settle an account -- the court finds this statement is supported in part by the testimony

of Lori Lee[14] who states that if a patient offers to settle his or her account on a percentage basis,

Brookwood has to approve the settlement. (Lee Dep. at 59-60). This is contrary to the testimony

of Hernandez that CFC has the authority to settle transferred accounts on behalf of Brookwood

without its express approval.[15] (Hernandez Aff. at ¶ 9). Hernandez further states that CFC

settles accounts on its own all the time. (Lee Dep. at 59-60). The court, however, does not find

Brookwood's approval of patient settlement offers to be sufficient to impose liability on

Brookwood. In view of the totality of the circumstances, Brookwood's approval of settlement

amounts when a percentage is offered by the patient is not a sufficient reservation of a right of

control in this case to create a question for the jury on the issue of agency. Besides, approval of

settlement offers has more to do with the result of CFC's work rather than the manner or means

by which it is conducted.

Finally, the court does not find the fact that Brookwood communicated with the plaintiff

and failed to tell him to deal directly with CFC to be sufficient evidence of a reservation of a

right of control. It is evident that Brookwood was involved in this matter to the extent of trying

to determine if the correct codes had been used for purposes of obtaining reimbursement. This,

according to Hernandez, is a matter that is reserved to the hospital. (Hernandez Dep. at 61). In

fact, her testimony provides that coding is a matter for the doctor. (*Id.*). Thus, Brookwood's

communications with the plaintiff also are not sufficient to impose liability.

In sum, the court finds that the evidence of an agency relationship is insufficient to allow

---

[14] The portions of Lee's deposition which are included with the plaintiff's response to the motion for summary judgment do not state Lee's position and job responsibilities. The defendant did not file any additional excerpts with its reply and did not challenge this evidentiary submission in any way.

[15] Brookwood has offered no explanation for this discrepancy.

this matter to proceed to trial as a matter of law.  There has been a lack of sufficient evidence of

the requisite right of control over the means and method by which CFC collects on the accounts

submitted to it to overcome the motion for summary judgment.[16]

Although the court finds that there is insufficient evidence of an agency relationship to

impose liability on Brookwood in this matter, the court will also address the individual claims

advanced by the plaintiff.

### Invasion of Privacy

The plaintiff's first claim alleges that the defendants' communications to her home

constituted an invasion of privacy.  (Complaint at ¶ 6).  In *Black v. Aegis Consumer Funding*

*Group, Inc.*, 2001 WL 228062 (S.D. Ala. 2001), the court stated:

> Alabama recognizes that a person has an actionable right to be free from
> the invasion of privacy. *Norris v. Moskin Stores, Inc.*, 132 So. 2d 321 (1961).[17]
> The tort of invasion of the right of privacy, insofar as it applies to a creditor and a
> debtor, is "the wrongful intrusion into one's private activities in such a manner as
> to outrage or cause mental suffering, shame or humiliation to a person of ordinary
> sensibilities." *Jacksonville State Bank v. Barnwell*, 481 So. 2d 863, 865 (1985);
> *Liberty Loan Corp. v. Mizell*, 410 So. 2d 45, 47 (1982); *Norris*, 132 So. 2d at
> 177-78; *accord I.C.U. Investigations, Inc. v. Jones*, ___ So. 2d ___, 2000 WL
> 869595, *3 (June 30, 2000 (Ala.)); *Phillips v. Smalley Maintenance Services, Inc.*,
> 435 So. 2d 705, 708 (Ala.) (on certified questions from the United States Circuit
> Court of Appeals for the Eleventh Circuit), 711 F.2d 1524 (11th Cir. 1983).

> As *Norris* cautioned, however, not every effort by a creditor to collect a

---

[16] To the extent that the plaintiff argued at the hearing on the motion that Brookwood held CFC out to be its agent when the plaintiff called Brookwood and its representative referred him to CFC, the test is "whether 'the potential principal[ ] [held] the potential agent out to third parties as having the authority to act.' *Malmberg*, 644 So. 2d at 891." *McGrady v. Nissan Motor Acceptance Corp.*, 40 F. Supp. 2d 1323, 1330-31 (M.D. Ala. 1998). Under the present circumstances, the court does not find that the referral of the plaintiff to CFC is sufficient to demonstrate "apparent authority" so as to impose liability. To find otherwise would preclude a creditor from directing the debtor to the organization that would be responsible for collecting the debt.

[17] "It is generally accepted that the tort of invasion of privacy consists of four distinct wrongs: 1) the intrusion upon the plaintiff's physical solitude or seclusion; 2) publicity which violates the ordinary decencies; 3) putting the plaintiff in a false, but not necessarily defamatory position in the public eye; and 4) the appropriation of some element of the plaintiff's personality for a commercial use. *Norris* at 323 (citing Prosser, Law of Torts 637-39 (2d ed. 1955))." *Black*, 2001 WL 228062, *4.

> debt rises to the level of a cause of action for the debtor. *Mizell*, 410 So. 2d at 47. "The mere effort of a creditor, . . . to collect a debt cannot without more be considered a wrongful and actionable intrusion. A creditor has and must have the right to take reasonable action to pursue his debtor and collect his debt." *Norris*, 132 So. 2d at 323. It is only "where the creditor takes actions which exceed the bounds of reasonableness, [that] the debtor has an action against the creditor for injuries suffered. *Barnwell*, 481 So. 2d at 865-66. What constitutes "reasonableness" depends on the facts of the case. *Norris*, 132 So. 2d at 323 (citing with approval *Housh v. Peth*, 135 N.E. 2d 440 (1955), *aff'd*, 133 N.E. 2d 340 (1956).[ ]

*Black*, 2001 WL 228062, at *4-5 (footnote omitted).

The Alabama Supreme Court has provided this court with some direction in determining whether the purported conduct in this matter is sufficient to allow this claim to proceed to trial. In *Black*, the defendant's collection agent telephoned the plaintiff a total of twenty times, fifteen of which occurred after he objected.[18] *Black*, 2001 WL 228062 at *2. Many of the calls occurred after 11:00 p.m. They were threatening in nature (*e.g.* "I will get the money from you either one way or another, and I'll start with your kids' clothing"), the caller talked with the plaintiff's husband, her child, her parents, a babysitter, and her employer. *Id*. Profanity was used more than once during the calls. *Id*. The caller made specific inquiries into the plaintiff's personal life (*e.g.*, asking where she worked, how much she made, whether she was married, who her husband was, whether she had children, and whether marital or financial problems were the basis of the default). *Id*. at *3. The court found that this conduct was sufficient to state a claim. *Id*. at *6.

In *Norris*, the court found that the defendant's conduct in calling numerous times at the plaintiff's wife's place of employment suggesting an illicit relationship was sufficient to state a claim. The court stated that the tactic was "a vicious attempt to coerce payment." *Norris*, 132

---

[18] The court in *Black* noted that the defendant "authorized, ratified or approved all of [the collection agent's conduct]." *Black*, 2001 WL 228062 at 4.

So. 2d at 325.  In *Barnwell*, a bank, in an attempt to collect on an installment loan agreement,

called the plaintiff at home and at work at least twenty-eight times during a six week period.

*Black*, 2001 WL 228062, at *5-6 (citing *Barnwell*, 481 So. 2d at 864).  The plaintiff was

reprimanded at work because of the calls.  *Id.*  The defendant also called his mother.  *Id.*  Still

further, the defendant contacted an individual to repossess the automobile.  When he was

unsuccessful at repossessing the car at his place of employment, in front of other employees, he

called him "a 'dead beat' and a 'son of a bitch' and threatened to use 'whatever force was

necessary. . . .'" *Id.*, citing *Barnwell*, at 865.  Ultimately, the plaintiff was reprimanded on the job

twice because of the situation.  *Id.*  The court found this conduct sufficient to state a claim.

 The defendant cites to *Liberty Loan Corp. of Gadsden v. Mizell*, 410 So. 2d 45 (Ala.

1982), in support of its motion.  In *Mizell*, the defendant sought to collect on a promissory note

executed by the plaintiff and her husband with the defendant.  The plaintiff asserted that she was

not responsible for the loan because her husband had borrowed the money; he filed for

bankruptcy; the defendant was aware of this before it contacted her at home and at work

numerous times; she made the defendant aware that her husband was responsible for the debt

according to their divorce decree; the defendant filed suit against her; the defendant threatened

her numerous times; and, the defendant reported her past due debt to certain credit rating

companies.  *Id.* at 47.  After a jury verdict for the plaintiff, the defendant appealed.  Reversing

and remanding the case, the Supreme Court found the evidence insufficient to support a finding

of unreasonableness.  *Id.* at 48.  Specifically, citing *Norris*, the Court found an absence of

conduct showing a pattern "of repeated conduct equating deliberate harassment, or systematic

campaigns designed to vilify the debtor or expose him to public ridicule." *Id.*

Each of the foregoing cases are factually distinguishable from the present matter. The situation is closer to that in *Mizell* than that in *Norris*, *Barnwell*, or *Black*. The facts herein do not support a inference of a "systematic campaign of harassment" or "deliberate harassment." Although the court does not necessarily approve of Brookwood's actions, it (the court) cannot find that the evidence is sufficient to support a conclusion that Brookwood's actions exceed the bounds of reasonableness. This is true even if all of the conduct of CFC is attributed to Brookwood. Accordingly, the motion for summary judgment is due to be granted on the invasion of privacy claim.

### Intentional Infliction of Emotional Distress

The plaintiff next asserts that the defendants' refusal to cease communicating with him constitutes an intentional infliction of emotional distress. (Complaint at ¶ 12). The Alabama Supreme Court does not recognize a tort for the intentional infliction of emotional distress, rather it recognizes the tort of outrage where

> willful wrongs, or those made so recklessly as to equate to willfulness, authorize recovery in damages for the mental suffering caused thereby, and we now recognize that one who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress and for bodily harm resulting from the distress. The emotional distress . . . must be so severe that no reasonable person could be expected to endure it. Any recovery must be reasonable and justified under the circumstances, liability ensuing only when the conduct is extreme. Comment, *Restatement (Second) of Torts*, § 46 (1965) at 78. By extreme we refer to conduct so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society. Comment (d), *Restatement, supra* at 72.

*American Road Service Co. v. Inmon*, 394 So. 2d 361, 365 (Ala. 1981).

> The tort of outrage is an extremely limited cause of action. It is so limited that this Court has recognized it in regard to only three kinds of conduct: (1) wrongful

31

conduct in the family-burial context, *Whitt v. Hulsey*, 519 So. 2d 901 (Ala. 1987);
(2) barbaric methods employed to coerce an insurance settlement, *National Sec.
Fire & Cas. Co. v. Bowen*, 447 So. 2d 133 (Ala. 1983); and (3) egregious sexual
harassment, *Busby v. Truswal Sys. Corp.*, 551 So. 2d 322 (Ala. 1989). *See also*
Michael L. Roberts and Gregory S. Cusimano, Alabama Tort Law, § 23.0 (2d ed.
1996). In order to recover, a plaintiff must demonstrate that the defendant's
conduct "(1) was intentional or reckless; (2) was extreme and outrageous; and
(3) caused emotional distress so severe that no reasonable person could be expected to
endure it." *Green Tree Acceptance, Inc. v. Standridge*, 565 So. 2d 38, 44 (Ala. 1990)
(citing *American Road Service Co. v. Inmon*, 394 So. 2d 361 (Ala. 1981)).

*Potts v. Hayes*, 771 So. 2d 462, 465 (Ala. 2000).

The court finds that the present situation is insufficient as a matter of law to state an

outrage claim even if all of the plaintiff's allegations involving CFC and Brookwood are

considered. First, this situation does not fit within one of the three kinds of conduct recognized

by the Alabama Supreme Court to support such a claim. Second, the facts are insufficient to

satisfy the "extreme and outrageous" requirement. *Potts*, 771 So. 2d at 465, quoting *Standridge*,

565 So. 2d at 44 (citing *Inmon*, 394 So. 2d 361). Third, the facts are insufficient for this court to

find that the conduct was significant enough so as to have "caused emotional distress so severe

that no reasonable person could be expected to endure it." *Id.*

### False Light

The plaintiff next alleges that the defendants placed her in a "false light and made

undesirable and negative character and credit reputation remarks on or about" her. (Complaint at

¶ 16). In *Schifano v. Greene County Greyhound Park, Inc.*, 624 So. 2d 178, 180 (Ala. 1993), the

court stated:

> Restatement (Second) of Torts, § 652E, and the comments to that section
> are equally meaningful with regard to the definition of, and liability for, placing a
> person in a false light. Section 652E states:

> "One who gives publicity to a matter concerning another that places the other before the public in a false light is subject to liability to the other for invasion of his privacy, if
>
>> "(a) the false light in which the other was placed would be highly offensive to a reasonable person, and
>>
>> "(b) the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed."

Publicity "means that the matter is made public, by communicating it to the public at large, or to so many persons that the matter must be regarded as substantially certain to become one of public knowledge . . . . It is one of a communication that reaches, or is sure to reach, the public." Restatement (Second) of Torts § 652D cmt. note a. (1977). The comments to the restatement also provide:

> Thus it is not an invasion of the right of privacy, within the rule stated in this Section, to communicate a fact concerning the plaintiff's private life to a single person or even to a small group of persons. On the other hand, any publication in a newspaper or a magazine, even of small circulation, or in a handbill distributed to a large number of persons, or any broadcast over the radio, or statement made in an address to a large audience, is sufficient to give publicity within the meaning of the term as it is used in this Section. The distinction, in other words, is one between private and public communication.

*Id.* Although not directly on point, one of the relevant illustrations provided in the restatement under the heading of "Publicity" is instructive. It provides:

> A, a creditor, writes a letter to the employer of B, his debtor, informing him that B owes the debt and will not pay it. This is not an invasion of privacy under this Section.

*Id.* at Ill. 1.

The court does not find that Brookwood's transfer of the plaintiff's purportedly past due

33

account to CFC for collection to be the type of communication subject to a "false light" claim.  It

lacks the "publication" anticipated in the Restatement.  It is more akin to the example cited in the

above illustration.  Accordingly, the court finds that the defendant's motion for summary

judgment is due to be granted.

### Defamation, Liable and Slander

The plaintiff next asserts that Brookwood is responsible for the publication of this

account information "to CFC, from CFC to the credit reporting agencies, and from the credit

reporting agencies to various third parties."  (Doc. 30 at 14; Complaint at p. 21).  The defendant

asserts that this claim is due to be dismissed because (1) there was no publication; (2) there was

no false or defamatory statement; (3) it is protected by qualified immunity; and (4) of the

Alabama Supreme Court's holding in *Liberty Loan Corp. of Gadsden v. Mizell*.  (Doc. 21, Ex. A

at 12-13).

The parties agree that publication is necessary to state a claim.  However, they disagree as

to whether there was publication.  As stated above, the plaintiff asserts that Brookwood is

responsible for the publication of this account information "to CFC, from CFC to the credit

reporting agencies, and from the credit reporting agencies to various third parties."  (Doc. 30 at

14).  The plaintiff supports this assertion by stating that

> Steele testified that both Brookwood's name and CFC's name were on the
> negative credit statement.  (Steele Depo. p. 147).  Steele further testified that the
> credit information was transmitted on at least one occasion, to Chase Bank, which
> denied him a credit card due, in part, to his derogatory credit statement.  (Steele
> Depo. p. 5, 66, 67, 68).  The attached credit reports evidence that the derogatory
> credit statement was actually publicized to Chase Manhattan Bank, Credit First
> NA, Sears, Providian, Capital One, and Bank of America.  As a result of
> Brookwood and CFC's reporting, Steele's credit reputation was damaged and
> third persons, i.e. Chase, were deterred from associating with Steele.  Thus, Steele

has established a prima facie case of defamation.

(Doc. 30 at 15).

The court finds no evidence in the record that Brookwood published the account status to anyone or any agency other than CFC. As just quoted, the plaintiff asserts that Brookwood and CFC's names were on the report. However, there is no evidence to support a conclusion that Brookwood communicated this information to the credit reporting agencies. For instance, although the Memphis Consumer Credit Association report lists Brookwood as the "[c]lient," it also lists this information as "Collection Agency Account Information." (Doc. 30, Ex. 6). It does not say that Brookwood was the reporting agency. Similarly, the Trans Union report lists the collection as being placed with CFC. (*Id*. at Ex. 7). It lists the creditor as Brookwood; but does not state that it was the reporting agency. (*Id*.). When the Trans Union report was updated, the contact was listed as CFC, not Brookwood.[19] (*Id*., Ex. 8 at 2). Lastly, the Experian report lists CFC as the source of the Brookwood debt. (*Id*., Ex. 9 at 2). These documents are consistent with the affidavits of Hernandez and Ainsworth that Brookwood did not directly communicate any information regarding the plaintiff's account to any credit bureau or reporting agency. (Ainsworth Aff. at ¶ 6; Hernandez Aff. at ¶ 7). The plaintiff has offered no evidence to contradict this information. His statements that Brookwood's name was on the report and his statement that the information was transmitted to various other third parties is not sufficient to attribute those actions to Brookwood under the circumstances. The motion for summary judgment is due to be granted.

With regard to the defendant's assertion that the plaintiff's claim must fail because the

---

[19] There is no additional evidence in the record as to what entity or person verified the account status.

information communicated, that the account is unpaid and the plaintiff is responsible for the debt, is true, the court finds that there are factual disputes that would otherwise preclude the granting of the defendant's motion for summary judgment on this basis. The plaintiff still steadfastly asserts that he has not owed and does not now owe the money, the defendant steadfastly asserts that he does owe the money. Summary judgment would, therefore, be precluded on this ground.

With regard to the defendant's assertion of a qualified privilege as being a complete defense to this claim, it contends that the communication of this information is privileged because it was done "in the execution of a legitimate and good faith effort to collect the plaintiff's past due account." (Doc. 21, Ex. A at 18). The Alabama Supreme Court has recently made it clear that "'[w]here a party makes a communication, and such communication is prompted by duty owed either to the public or to a third party, or the communication is one in which the party has an interest, and it is made to another having a corresponding interest, the communication is privileged. . . .'" *Ex parte Blue Cross and Blue Shield*, 773 So. 2d 475, 478-79 (Ala. 2000). The court has further required that the plaintiff demonstrate and prove actual malice to overcome a claim of qualified privilege. *Id.* at 479. Actual malice is defined as "knowledge that it was false or with reckless disregard of whether it was false or not." *Loveless v. Graddick*, 325 So. 2d 137, 142 (Ala. 1975) (citing *New York Times v. Sullivan*, 376 U.S. 254, 84 S. Ct. 710, 11 L. Ed. 2d 686 (1964)). The Alabama Supreme Court has also stated that "disposition of the issue of actual malice by summary judgment is generally inappropriate." *Gore v. Health-Tex, Inc.*, 567 So. 2d 1307, 1308 (Ala. 1990) (citing *Loveless*, 325 So. 2d 137). "However, where no proof of malice is offered at all, summary judgment is appropriate." *Id.*

36

The plaintiff asserts that the evidence shows actual malice.  According to the plaintiff, Brookwood's communications were made with full knowledge of the dispute, Brookwood told Steele he would need a subpoena to obtain his itemized statement, and Brookwood failed to take any action to resolve the dispute or report his account as disputed after Steele complained orally and in writing to it.

At the time of the initial referral of the collection matter, there is no evidence of actual malice on the part of the defendant.  The subsequent communications between Brookwood and Steele and CFC, while not the business paragon of the handling of a collections account, are not sufficient to constitute actual malice to overcome the defendant's qualified privilege defense.

Lastly, as to the defamation claim, the defendant asserts that under the authority of *Liberty Loan Corp.*, the motion for summary judgment is due to be granted.  Specifically, it asserts that in that case, as well as the present matter, the facts fail to show any lack of good faith on the part of Brookwood, any evidence of publication, and that its conduct is privileged.  (Doc. 21, Ex. A at 20).  The plaintiff counters that *Liberty Loan* is distinguishable because the plaintiff therein "actually owed the debt, and truth is an absolute defense," there was no publication to a credit bureau or similar organization, and because there is substantial evidence of a lack of good faith and actual malice on the part of Brookwood.  (Doc. 30 at 19).

Although *Liberty Loan* is instructive, it is not dispositive in this matter.  It is factually distinguishable.  This court has addressed the defendant's asserted defenses in the previous discussion and adopts the same regarding the application of *Liberty Loan*.

## FDCPA

The plaintiff also brings a final claim pursuant to the FDCPA.  15 U.S.C. § 1692, *et seq.*[20]

The plaintiff alleges that Brookwood and CFC, as the agent of Brookwood, violated various

provisions in the Act.  Section 1692(e) states that "the purpose of this subchapter [is] to eliminate

abusive debt collection practices by debt collectors, to insure that those debt collectors who

refrain from using abusive debt collection practices are not competitively disadvantaged, and to

promote consistent State action to protect consumers against debt collection abuses."  15 U.S.

§ 1692(e).  The term "debt collector" is defined by the Act as any person who uses any

instrumentality of interstate commerce or the mails in any business the principal purpose of

which is the collection of any debts, or who regularly collects or attempts to collect, directly or

indirectly, debts owed or due or asserted to be owed or due another.[21]  15 U.S.C. § 1692a(6).

Brookwood asserts that its motion for summary judgment is due to be granted on this

claim because (1) there is no agency relationship between Brookwood and CFC upon which

vicarious liability may be imposed; (2) there is no allegation that Brookwood directly violated the

FDCPA; (3) Brookwood is not a "debt collector" for purposes of the Act; and, (4) the plaintiff's

claim is barred by the statute of limitations.  (Doc. 21 at 21-26).  The plaintiff retorts that CFC is

governed by the Act, it violated the Act,[22] and Brookwood "is responsible and liable for the

actions of its agent, CFC."  (Doc. 30 at 21).

---

[20] Section 1692k provides for civil liability for violations of the Act.  15 U.S.C. § 1692k.

[21] There are seven exceptions, however, none are applicable in this matter.

[22] The plaintiff asserts CFC violated the Act by sending written correspondence that did not include the required information; it continued telephoning him after he informed CFC that he did not owe the money and he requested they stop calling; CFC called with the intent to "annoy, abuse, or harass" him "in an effort to coerce him into paying a debt which both CFC and Brookwood knew" he disputed; and, CFC and Brookwood failed to communicate that this debt was disputed to other agencies.  (Doc. 30 at 19-20).

The first issue is whether the plaintiff's claim is barred by the applicable one-year statute of limitations. *See* 15 U.S.C. § 1692k(d). Under this section, a claim must be brought within one year from the date on which the violation occurs. *Id.* The defendant asserts that the FDCPA claim is untimely because the amended complaint adding this claim was not filed until December 28, 2001, over one year after any relevant acts occurred.[23] The plaintiff counters that the claim is timely in that it, the original complaint, which enumerates the factual predicate for the FDCPA claim was filed on March 2, 2001, well within the one year period. (*Id.*). Additionally, it asserts that the FDCPA claim is timely because under the Alabama Rules of Civil Procedure, the claim "relates back" to the filing of the original complaint. (*Id.*, citing *Sonnier v. Talley*, 806 So. 2d 381, 386-87 (Ala. 2001) and ALA. R. CIV. P. 15(c)).

Because it appears from the record that the FDCPA claim arises from the facts alleged in the original complaint, the claim is not barred by the statute of limitations. The amended complaint merely adds the new claim under the FDCPA which purportedly arises out of the same transaction and occurrences. Therefore, it relates back to the filing of the original complaint. *Sonnier*, 806 So. 2d at 387 (citing *National Distillers & Chem. Corp. v. American Laubscher Corp.*, 338 So. 2d 1269, 1273-74 (Ala. 1976), quoting 3 James W. Moore et al., Moore's Federal Practice and Procedure, ¶ 15.15[3], pp. 1025-31 (1968 ed.).

The next issue is whether Brookwood acted as a principal or an agent concerning these matters. As previously discussed, the court finds no evidence in the record that Brookwood acted as a principal. Although the plaintiff asserts that Brookwood (and CFC) represented that his

---

[23] The defendant asserts that CFC's last telephone call was initiated by CFC on December 10, 2000. (Doc. 21, Ex. A, p. 26, n.58). The defendant also states that CFC's March 16, 2000, letter triggered the limitations period. (*Id.* at p. 26).

account was a "collection account" to credit reporting agencies, as noted in the last section, the record does not support this conclusion.  To reiterate the foregoing findings, there is no evidence that Brookwood was the principal making the report to the credit agencies.  This includes all of the documents, the affidavits, and the depositions before the court.

Even if the court were to determine that Brookwood communicated or provided this information to the credit agencies, the plaintiff would be entitled to no relief because Brookwood is not a "debt collector" under § 1692a(6).  The undisputed evidence is that Brookwood is a healthcare services provider, not a debt collection business.  It is evident that that is why this account was referred to CFC for collection.  (*See* Ainsworth Aff. at ¶ 4).  Accordingly, Brookwood is not subject to the FDCPA.  *See McGrady v. Nissan Motor Acceptance Corp.*, 40 F. Supp. 1323, 1335 (M.D. Ala. 1998) ("Generally, 'actual creditors . . . are not subject to the act.'") (citing *James v. Ford Motor Credit Co.*, 842 F. Supp. 1202, 1207 (D. Minn.), *aff'd*, 47 F.3d 961 (8th Cir. 1995).

The next question is whether CFC is the agent of Brookwood for purposes of this claim.  The court has already determined that Brookwood's actions in this case do not support imposition of liability premised on agency principals.  The result of the foregoing analysis is no different on this claim than on the state law claims.  Thus, the defendant's motion for summary judgment is due to be granted on the plaintiff's claims under the FDCPA.

## CONCLUSION

Premised on the reasons stated above, the defendant's motion for summary judgment (doc. 21) is due to be granted and the plaintiff's motions to strike (doc. 24 and 34) are due to be granted in part and denied in part.  An appropriate order will be entered.

**DONE**, this the _23rd_ day of April, 2003.

**JOHN E. OTT**
United States Magistrate Judge